[Sac. No. 7896. In Bank. Aug. 17, 1971.]

THE PEOPLE ex rel. EVELLE J. YOUNGER, as Attorney General, etc., Petitioner, v.
COUNTY OF EL DORADO et al., Respondents.

## COUNSEL

Evelle J. Younger, Attorney General, Robert H. O'Brien and E. Clement Shute, Jr., Deputy Attorneys General, for Petitioner.

Noble Sprunger, County Counsel, for Respondents.

Melvin E. Beverly, City Attorney (South Lake Tahoe), and James L. Brunello, Deputy City Attorney, as Amici Curiae on behalf of Respondents.

## OPINION

**SULLIVAN, J.**—The Attorney General, on behalf of the People of the State of California, seeks a writ of mandate commanding the Counties of El Dorado and Placer to pay to the Tahoe Regional Planning Agency (Agency) the amounts of money respectively allotted to them by the Agency as being necessary to support its activities. We issued an alternative writ of mandate to which respondents have made return by answer. The issues thus presented to us are of great concern to California, to its neighbors and, indeed, to the entire country.

The controversy which we are required to review focuses upon the Lake Tahoe Basin—an area of unique and unsurpassed beauty situated high in the Sierras along the California-Nevada border.[1] Mark Twain, an early visitor to the region, viewed the lake as "a noble sheet of blue water lifted six thousand three hundred feet above the level of the sea . . . with the shadows of the mountains brilliantly photographed upon its still surface . . . the fairest picture the whole earth affords."[2] Year after year the lake and its surrounding mountains have attracted and captivated countless visitors from all over the world.

However, there is good reason to fear that the region's natural wealth contains the virus of its ultimate impoverishment. A staggering increase

[1] "The Lake Tahoe Basin comprises a 500-square-mile area bounded on the west by the crest of the Sierra Nevada and on the east by the Carson Range. It is divided lengthwise by the California-Nevada State line with 75 percent of the land area and 70 percent of the lake surface area in California. About 40 small mountain lakes and 60 streams are within the basin which is drained by the Truckee River. Lake Tahoe itself is 22 miles long and 12 miles wide with a natural surface elevation of 6,223 feet above sea level. A small outlet dam raises the level to a maximum 6,229 feet above sea level. About one-third of the basin is comprised of mountainous terrain with the remainder made up of slopes ranging from 1 to 25 percent." (S. Rep. 91-510, 91st Cong., 1st Sess. (1969) appearing at 115 Cong. Rec. 33068-33069 (1969).)

[2] 1 Roughing It (Harper & Row) chapter 22, page 156.

in population, a greater mobility of people, an affluent society and an incessant urge to invest, to develop, to acquire and merely to spend—all have combined to pose a severe threat to the Tahoe region.[3] Only recently has the public become aware of the delicate balance of the ecology,[4] and of the complex interrelated natural processes which keep the lake's waters clear and fresh,[5] preserve the mountains from unsightly erosion, and maintain all forms of wildlife at appropriate levels. Today, and for the foreseeable future, the ecology of Lake Tahoe stands in grave danger before a mounting wave of population and development.

---

[3]"A combination of modern trends has triggered explosive growth and development in the basin and along the lake shore. First, the advent of the high-speed, all-weather highway brought Lake Tahoe to within a short few hours' drive of major California population centers. This was coupled with a postwar boom in tourism and outdoor recreation that converted Lake Tahoe from a quiet summer resort to a year-round playground for water sports, skiing, and entertainment.

"Population growth in the postwar years, particularly since the mid-1950's, has been rapid, perhaps exceeding even the explosive increases now characteristic of the Western United States. Although population data are not normally gathered on a regional basis, a special tabulation by the U.S. Census Bureau fixed the 1960 population of the basin at 12,461 permanent residents. Estimates in 1966 put the figure at 28,750, representing a tenfold increase since 1956. Peak summer population, estimated at 36,400 in 1956, now exceeds 150,000. It is forecast that by 1980 the permanent population will top 50,000 and the summer peak will exceed 300,000.

"This rapid population growth and accompanying commercial and residential development has posed a serious threat to the Lake Tahoe Basin's fragile ecology. Not only the scenic beauty of the region but the very quality of its natural environment are now at stake. Ominous signs of water pollution are becoming all too evident. The native Lahontan cutthroat trout no longer survive in Lake Tahoe because of man-caused changes in the habitat. Tree removal, excavations, highway construction, landfill, and other development activities have scarred the basin slopes and triggered destructive erosion. Outdoor recreation facilities, meanwhile, have not kept pace with the expanding public demands and accepted projections are for that demand to increase by five times in the period between 1960 and 1980. Fortunately, Federal and private land ownership patterns have served to maintain much of Lake Tahoe's natural shoreline quality, particularly the eastern shore, however, pressures are mounting to develop these areas." (S.Rep. 91-510, *supra.*)

[4]See, e.g., Harte and Socolow, *The Everglades: Wilderness Versus Rampant Land Development in South Florida* (1971) 1 Environmental Affairs 140.

[5]"Lake Tahoe, a High Sierra Mountain lake, is famed for its scenic beauty and pristine clarity. Of recent geologic origin, the 190-square-mile lake bore little evidence of even natural aging processes when it was discovered by John Fremont in 1844. Because of its size, its 1,645-foot depth and its physical features, Lake Tahoe was able to resist pollution even when human activity began accelerating as a result of settlement and early logging operations. Even by 1962 its waters were still so transparent that a metal disc 20 centimeters in diameter reportedly could be seen at a depth of 136 feet and a light transmittance to a depth of nearly 500 feet as detected with a hydrophotometer.

"Only two other sizable lakes in the world are of comparable quality—Crater Lake in Oregon, which is protected as part of the Crater Lake National Park, and Lake Baikal in the Soviet Union. Only Lake Tahoe, however, is so readliy accessible from large metropolitan centers and is so adaptable to urban development." (S.Rep. 91-510, *supra.*)

In an imaginative and commendable effort to avert this imminent threat, California and Nevada,[6] with the approval of Congress (Pub. Law 91-148), entered into the Tahoe Regional Planning Compact (Compact) the provisions of which are found in Government Code section 66801.[7] The basic concept of the Compact is a simple one—to provide for the region as a whole the planning, conservation and resource development essential to accommodate a growing population within the region's relatively small area without destroying the environment.

To achieve this purpose, the Compact establishes the Tahoe Regional Planning Agency with jurisdiction over the entire region. (§ 66801, art. III, subd. (a).) The Agency has been given broad powers to make and enforce a regional plan of an unusually comprehensive scope. This plan, to be adopted on or before September 1, 1971, must include, as correlated elements, plans for land-use, transportation, conservation, recreation, and public services and facilities. (§ 66801, art. V, subd. (b).)[8] The Compact

---

[6]"Recognizing the seriousness and complexity of the problem, the legislatures of California and Nevada in 1965 authorized a concurrent study of the Lake Tahoe Basin's planning and development control needs. The Lake Tahoe Joint Study Committee created by this legislation worked closely with local government in developing its report that was submitted to the two legislatures in March of 1967. Legislation developed from the study authorizing the formulation of a bistate Tahoe Regional Planning Agency with broad powers subsequently passed both legislatures and was submitted to Congress for ratification in 1968." (S. Rep. 91-510, *supra.*) For a more complete discussion of the formation of the Compact, see Ayer, *Water Quality Control at Lake Tahoe* (1971) 1 Ecology L. Q. 3, 50-57; Note, *Regional Government for Lake Tahoe* (1971) 22 Hastings L.J. 705, 708-715.

[7]Hereafter, unless otherwise indicated, all references to section 66801 are to that section of the Government Code.

[8]Section 66801, article V, subdivision (b) provides in relevant part: "The regional plan shall include the following correlated elements:

"(1) A land-use plan for the integrated arrangement and general location and extent of, and the criteria and standards for, the uses of land, water, air, space and other natural resources within the region, including but not limited to, an indication or allocation of maximum population densities.

"(2) A transportation plan for the integrated development of a regional system of transportation, including but not limited to, freeways, parkways, highways, transportation facilities, transit routes, waterways, navigation and aviation aids and facilities, and appurtenant terminals and facilities for the movement of people and goods within the region.

"(3) A conservation plan for the preservation, development, utilization, and management of the scenic and other natural resources within the basin, including but not limited to, soils, shoreline and submerged lands, scenic corridors along transportation routes, open spaces, recreational and historical facilities.

"(4) A recreation plan for the development, utilization, and management of the recreational resources of the region, including but not limited to, wilderness and forested lands, parks and parkways, riding and hiking trails, beaches and playgrounds, marinas and other recreational facilities.

"(5) A public services and facilities plan for the general location, scale and pro-

emphasizes that in formulating and maintaining this regional plan, the Agency "shall take account of and shall seek to harmonize the needs of the region as a whole. . . ." (*Id.*)

. The Agency is given the power to "adopt all necessary ordinances, rules, regulations and policies to effectuate the adopted regional . . . ." plan. (§ 66801, art. VI, subd. (a).) While ordinances so enacted establish minimum standards applicable throughout the region, local political subdivisions may enact and enforce equal or higher standards. "The regulations shall contain general, regional standards including but not limited to the following: water purity and clarity; subdivision; zoning; tree removal; solid waste disposal; sewage disposal; land fills, excavations, cuts and grading; piers; harbors, breakwaters; or channels and other shoreline developments; waste disposal in shoreline areas; waste disposal from boats; mobilehome parks; house relocation; outdoor advertising; flood plain protection; soil and sedimentation control; air pollution; and watershed protection. Whenever possible without diminishing the effectiveness of the . . . general plan, the ordinances, rules, regulations and policies shall be confined to matters which are general and regional in application, leaving to the jurisdiction of the respective states, counties and cities the enactment of specific and local ordinances, rules, regulations and policies which conform to the . . . general plan." (*Id.*) The Compact also provides that "[v]iolation of any ordinance of the [A]gency is a misdemeanor." (§ 66801, art. VI, subd. (f).) Finally, it states that "all public works projects shall be reviewed prior to construction and [except for certain state public works projects] approved by the [A]gency as to the project's compliance with the adopted regional general plan." (§ 66801, art. VI, subd. (c).)

The governing body of the Agency is composed of ten members, five from California and five from Nevada. The Boards of Supervisors of El Dorado and Placer Counties and the City Council of the City of South Lake Tahoe each appoint one member; "[e]ach [such] member shall be a member of the city council or county board of supervisors which he represents and, in the case of a supervisor, shall be a resident of a county supervisorial district lying wholly or partly within the region." (§ 66801, art. III, subd. (a).) The Boards of County Commissioners of the Counties of Douglas, Ormsby and Washoe in the State of Nevada each select one member; each member must be a resident of the county from which he is appointed and may, in the discretion of the board of county commissioners, but is not required to be, a member of the board which appoints him and a

---

vision of public services and facilities, which, by the nature of their function, size, extent and other characteristics are necessary or appropriate for inclusion in the regional plan."

resident or owner of real property in the region. The Administrator of the California Resources Agency, or his designee, and the Director of the Nevada Department of Conservation and Natural Resources, or his designee, are ex officio members of the board. Finally, the Governors of California and Nevada each appoint one member, who "shall not be a resident of the region and shall represent the public at large." (§ 66801, art. III, subd. (a).)

The Compact permits the Agency to receive fees for its services, gifts, grants and other financial aids. It also provides for Agency financing as follows: "Except as provided in subdivision (e),[9] on or before December 30 of each calendar year the agency shall establish the amount of money necessary to support its activities for the next succeeding fiscal year commencing July 1 of the following year. The agency shall apportion not more than $150,000 of this amount among the counties within the region on the same ratio to the total sum required as the full cash valuation of taxable property within the region in each county bears to the total full cash valuation of taxable property within the region. Each county in California shall pay the sum allotted to it by the agency from any funds available therefor and may levy a tax on any taxable property within its boundaries sufficient to pay the amount so allocated to it. Each county in Nevada shall pay such sum from its general fund or from any other moneys available therefor." (§ 66801, art. VII, subd. (a).)

After ratification of the Compact by Congress and upon proclamation of the Governors of California and Nevada, the Agency came into existence on March 19, 1970. It adopted a budget, pursuant to section 66801, article V, subdivisions (a) and (e), for the fourth quarter of the fiscal year 1969-1970—that is, for the months April through June 1970. Of the total budget[10] of $81,770.85, $22,344.68 was allotted to El Dorado County, and $10,322.98 to Placer County. However, no specific demand was made upon the counties to pay the amounts apportioned to them, and they have consistently refused to do so.

The Agency has also adopted a budget of $180,000 for the fiscal year

---

[9]Subdivision (e) provides: "As soon as possible after the ratification of this compact, the agency shall estimate the amount of money necessary to support its activities: [Par.] (1) For the remainder of the then current fiscal year; and [Par.] (2) If the first estimate is made between January 1 and June 30, for the fiscal year beginning on July 1 of that calendar year. [Par.] The agency shall then allot such amount among the several counties, subject to the restriction and in the manner provided in paragraph (a), and each county shall pay such amount."

[10]The total budgetary figures given in the text are for sums contributed by state and local governmental bodies. In addition, the Agency derived about a third of its total funds from the United States Department of Housing and Urban Development.

1970-1971. Of this sum, the amount apportioned to El Dorado County is $60,150 and that allotted to Placer County is $33,600. No demand was made upon either county for such sums until December 29, 1970. The counties have refused to pay the above sums or any part of them.

For the fiscal year 1971-1972, the Agency has adopted a budget of $222,400, of which El Dorado County's share is $54,450, and Placer County's share is $40,350. The Attorney General asserts that, absent an order of this court, the counties will refuse to pay these sums.

The positions of the parties before us may be summarized as follows: the Attorney General contends that the respondent counties have a clear duty, imposed by the Compact, to pay their share of the funds necessary to support the activities of the Agency and that we should compel the performance of this duty by a writ of mandate. The counties contend first, that they are not required to make any payments to the Agency because the Compact is unconstitutional and void and, secondly, that the remedy here sought is inappropriate because the People have a plain, speedy and adequate remedy at law.[11]

## I

We first inquire into the propriety of the remedy invoked by petitioner. A writ of mandate will lie to "compel the performance of an act which the

---

[11]On March 19, 1971, the Counties of El Dorado and Placer brought an action for declaratory relief in El Dorado County against the Agency seeking a decree declaring that the Compact violates provisions of the United States and California Constitutions. The Agency filed an answer and cross-complaint on April 5, 1971. No further action has been taken in that suit.

Prior to Congressional approval of the Compact, California established the California Tahoe Regional Planning Agency. (See Gov. Code, § 67000 et seq.) The purpose of that agency is explained in the following portion of Senate Report 91-510, *supra:* "Because of the urgency of the regional planning needs the Nevada Legislature adopted interim legislation in February of 1969 creating the Nevada Tahoe Regional Planning Agency to work with a counterpart California agency that had been operating since 1967. This provided immediate authority for the States to prepare a regional plan and for the exercise of individual controls pending congressional ratification of the bistate compact. Although the States cannot work together officially until the compact is ratified, the State agencies did undertake the employment of a joint staff to insure coordinated efforts. The Nevada agency, with the concurrence of the California agency, was prepared by the summer of 1969 to retain a planning consultant for the purpose of drawing up the Nevada portion of the regional plan." Although the Compact has since been approved, the California Tahoe Regional Planning Agency continues to exist. (See Note, *supra,* 22 Hastings L.J. 705, 713-715.)

On October 30, 1970, the Counties of El Dorado and Placer brought an action for declaratory relief against that agency alleging that it, too, violated state and federal constitutional provisions. The Attorney General advises us that the trial court has ruled against the counties in that suit, but that the counties have indicated they will appeal.

law specifically enjoins, as a duty resulting from an office, trust, or station" (Code Civ. Proc., § 1085) "upon the verified petition of the party beneficially interested," in cases "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.)

■ The writ will issue against a county, city or other public body or against a public officer. (*Housing Authority* v. *City of L. A.* (1952) 38 Cal.2d 853, 869-871 [243 P.2d 515], cert. den. (1952) 344 U.S. 836 [97 L.Ed. 651, 73 S.Ct. 46]; *Hawthorn* v. *City of Beverly Hills* (1952) 111 Cal.App.2d 723, 731 [245 P.2d 352].)[12] However, the writ will not lie to control discretion conferred upon a public officer or agency. (*Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4]; *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 326 [253 P.2d 659].) ■ Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent (*Faulkner* v. *Cal. Toll Bridge Authority, supra*; *Sherman* v. *Quinn* (1948) 31 Cal.2d 661, 664 [192 P.2d 17]; *Browning* v. *Dow* (1923) 60 Cal.App. 680, 682 [213 P. 707]); and (2) a clear, present and beneficial right in the petitioner to the performance of that duty (*Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6]). (See generally 3 Witkin, Cal. Procedure (1954), Extraordinary Writs, § 40 et seq., pp. 2520 et seq.)

■ In the instant case, there is a clear duty imposed by law upon the counties. As already noted, section 66801, article VII, subdivision (a) provides that "[e]ach county in California *shall pay* the sum allotted to it by the agency from any funds available therefor . . . ." (Italics added.) The statute confers no discretion upon the counties; they must pay the sum apportioned to them.

There is also a beneficial right in the People of the State of California to compel the counties to perform their duty. The unique scenic attributes

---

[12]Code of Civil Procedure section 1085 states that the writ may be issued to any "inferior tribunal, corporation, board or person." While it has been said that counties are not municipal corporations but are political subdivisions of the state for purposes of government (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526]; *County of Los Angeles* v. *Riley* (1936) 6 Cal.2d 625, 627-628 [59 P.2d 139, 106 A.L.R. 903]; *County of San Mateo* v. *Coburn* (1900) 130 Cal. 631, 636-637 [63 P. 78, 621]; *Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 653, 656-657 [83 Cal.Rptr. 41]), counties have also been declared public corporations or quasi-corporations. (*Pitchess* v. *Superior Court, supra*; *Whelan* v. *Bailey* (1934) 1 Cal.App.2d 334, 339 [36 P.2d 709], overruled on other grounds in *Estate of Miller* (1936) 5 Cal.2d 588, 591 [55 P.2d 491]; *Smith* v. *Myers* (1860) 15 Cal. 33, 34; 1 McQuillin, Municipal Corporations (3d ed.) § 2.46, pp. 496-497.) In view of Government Code section 23003, which provides that a county is "a body corporate and public," and section 23004, subdivision (a) of the same code, which states that counties may sue and be sued, we think that a county is sufficiently corporate in character to justify the issuance of a writ of mandate to it.

which the Agency must preserve are enjoyed not only by the residents of the region but also by large numbers of the state's general citizenry. Failure of respondent counties to provide funds for the Agency at once impairs the functioning of that body and disturbs the harmony and effectiveness of interstate relations. The state, as a party to the interstate Compact, and as an entity which contributes funds to the Agency, has an important interest in securing the success of the Agency.

Finally, by issuing the alternative writ, we have necessarily determined that there is no adequate remedy in the ordinary course of law and that this case is a proper one for the exercise of our original jurisdiction (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 945 [92 Cal.Rptr. 309, 479 P.2d 669]; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]; see Cal. Rules of Court, rule 56(a)).

## II

We turn to the merits. The counties first contend that the Compact violates former sections 11, 12 and 13 of article XI of the California Constitution.[13] These sections were in effect when the Compact was executed and when the Agency came into actual existence. However, on June 2, 1970, as part of a revision of article XI, these sections were repealed. Former section 11 was readopted without substantial change as section 7 of the new article XI; former section 12 was readopted as section 37 of article XIII; and former section 13 was amended and readopted as section 11 of the new article XI.[14] Generally speaking, these sections confer upon specified local governmental bodies broad powers over purely local affairs. But, as we shall point out, the Compact is unaffected by any of the above provisions since its subject matter is of regional, rather than local, concern.

[13]Since, as we discuss below, we find that the Compact does not violate the California Constitution, we find it unnecessary to decide whether, under clause 2, article VI, of the United States Constitution, the provisions of the Compact would prevail over any conflicting provision of the state Constitution. (Cf. *Interstate Wreck. Co.* v. *Palisades Interstate Pk. Comm.* (1971) 57 N.J. 342, 348 [273 A.2d 10, 13-14]; with *People* v. *Central Railroad* (1870) 79 U.S. (12 Wall.) 455, 456 [20 L.Ed. 458, 459]; and *Henderson* v. *Delaware River, etc., Comm.* (1949) 362 Pa. 475, 485 [66 A.2d 843] cert. den. (1949) 338 U.S. 850 [94 L.Ed. 520, 70 S.Ct. 94].)

[14]As will appear, we conclude that the Compact legislation violates neither the former sections nor the new sections. Therefore, we need not decide whether the Compact would have been validated by the 1970 amendments, had it violated the former sections but not the present ones. (Cf. *Lee* v. *Superior Court* (1923) 191 Cal. 46, 53 [214 P. 972]; with *Fleming* v. *Hance* (1908) 153 Cal. 162, 164 [94 P. 620]; *German Sav. etc. Soc.* v. *Ramish* (1902) 138 Cal. 120, 131 [69 P. 89, 70 P. 1067]; *Banaz* v. *Smith* (1901) 133 Cal. 102, 104-105 [65 P. 309].)

The regional nature of the Compact is manifest from the express language of the legislation. Article I of the Compact which sets forth legislative findings and declarations of policy, provides in relevant part: "It is found and declared that the waters of Lake Tahoe and other resources of the Lake Tahoe region are threatened with deterioration or degeneration. [Par.] It is further declared that by virtue of the special conditions and circumstances of the natural ecology, developmental pattern, population distribution and human needs in the Lake Tahoe region, the region is experiencing problems of resource use and deficiencies of environmental control." The same article further declares the "need to maintain an equilibrium between the region's natural endowment and its manmade environment," and specifically recognizes "that for the purpose of enhancing the efficiency and governmental effectiveness of the region, it is imperative that there be established an areawide planning agency with power to adopt and enforce a regional plan of resource conservation and orderly development, to exercise effective environmental controls and to perform other essential functions . . . ."[15] ■ Of course, such findings and declarations of policy are entitled to great weight. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137]; *Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 449-450 [94 P.2d 794]; Wilson, *Consideration of Facts in Constitutional Cases* (1944) 17 So.Cal.L.Rev. 335.)

■ Even without such explicit findings we could hardly avoid a conclusion that the purpose of the Compact is to conserve the natural resources and control the environment of the Lake Tahoe Basin as a whole through area-wide planning. Lake Tahoe itself is an interstate body of water; the surrounding region, defined by the Compact, is also interstate, since it includes not only the lake but the adjacent parts of three counties of Nevada and two counties of California. (§ 66801, art. III, subd. (a).) The water that the Agency is to purify cannot be confined within one county or state; it circulates freely throughout Lake Tahoe. The air which the Agency must preserve from pollution knows no political boundaries. The wildlife which the Agency should protect ranges freely from one local jurisdiction to

---

[15]"The Lake Tahoe Basin, shared by the States of California and Nevada, has five county political subdivisions, two municipalities, more than 10 general improvement districts, three public utility districts, several sewer and sanitation districts, and innumerable public entities for schools, fire protection, soil conservation, and varied public services. In addition, the Federal Government owns and manages nearly half the total basin land area. The threat to Lake Tahoe's environment has been obvious and efforts to contain development and control the dangers of irreparable damage have been genuine and determined. However, the political fragmentation in the basin has prevented a unified and organized approach to the mounting problems." (S.Rep. 91-510, *supra.*) The failure of local governmental bodies to cope with Lake Tahoe's problems is graphically detailed in Comment, *Lake Tahoe: The Future of a National Asset—Land Use, Water, and Pollution* (1964) 52 Cal.L.Rev. 563, 565-572.

another. Nor can the population and explosive development which threatens the region be contained by any of the local authorities which govern parts of the Tahoe Basin.[16] Only an agency transcending local boundaries can devise, adopt and put into operation solutions for the problems besetting the region as a whole. Indeed, the fact that the Compact is the product of the cooperative efforts and mutual agreement of two states is impressive proof that its subject matter and objectives are of regional rather than local concern.

### A

Respondent counties first contend that the Compact violates former section 11 of article XI of the California Constitution. That section provided: "Any county, city, town or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws."[17] The counties argue that the Compact gives the Agency power to adopt local, police and sanitary ordinances, rules and regulations, violations of which are declared misdemeanors by section 66801, article VI, subdivision (f). According to their argument, "[t]hese powers have been granted to respondent counties by the California Constitution, and there is, therefore, a violation of Article XI, section 11, of the California Constitution in any attempt to grant these same powers to the Agency." In support of this contention, the counties cite *In re Werner* (1900) 129 Cal. 567, 574 [62 P. 97]; and *Gilgert* v. *Stockton Port District* (1936) 7 Cal.2d 384 [60 P.2d 847].

In *Werner,* this court struck down a state statute which purported inter alia to grant a sanitary district the power "[t]o make and enforce all necessary and proper regulations for suppressing disorderly and disreputable

---

[16]"In the area of land use regulation, the present county zoning ordinances and their enforcement have proved inadequate to insure an orderly and ecologically sound pattern of development. The unwillingness of the five counties to subordinate sectarian economic interests in rapid growth and development of the lake basin to the national interest in preserving the lake as a natural resource has been manifested not only in deficiencies of the present zoning laws, but also in frequent departures from existing controls. Responsibility for inadequacies in approach lies partly with local government operating in county seats geographically and economically removed from the Lake Tahoe basin and partly with the permanent residents. Neither group has recognized that Tahoe must be protected with restrictions on private enterprise in the interest of conservation." (Comment, *supra,* 52 Cal.L.Rev. 563, 618-619.)

[17]As already noted, pursuant to the revision of article XI in 1970, the subject matter of this section is now covered by article XI, section 7. The comment of the California Constitution Revision Commission to new section 7 states: "This . . . Section restates related existing provisions without change in meaning." (Cal. Const. Revision Com., Proposed Revision of the California Constitution (1968) p. 63.) Consequently, since we find that the Compact does not violate former section 11, it follows that it does not conflict with present section 7.

resorts and houses of ill-fame within the district, and to determine the qualifications of persons authorized to sell liquors at retail. . . ." (Stats. 1895, ch. 95, § 2, p. 85; see 129 Cal. at p. 570.) This court pointed out that a sanitary district was a public corporation, but not a municipal corporation, as specified in section 11. We, therefore, held that section 11 prohibited the Legislature from granting a sanitary district a power "which clearly falls within the police powers possessed by cities and other like corporations formed and organized for governmental purposes. Under the rule of construction, *Expressio unius est exclusio alterius,* the legislature has no authority to create other public corporate bodies—whether called districts or by any other name—and clothe them with the power to make and enforce local, police, sanitary, and other regulations conferred by the constitution upon counties, cities, towns, or townships." (129 Cal. at p. 574.)

The concurring opinion of Justice McFarland is more pointed: "[T]he Legislature cannot, under any circumstances, delegate to such a thing as a sanitary district the power of enacting penal legislation. That power must be confined to the municipalities mentioned in the constitution which are given police powers, etc. The constitution does not contemplate that the state should be overrun and overloaded with innumerable legislative bodies, each having power to make laws under which citizens may be sent to jail." (129 Cal. at p. 575.)

In *Gilgert* the problem arose again. There the Legislature had conferred upon the district the power to enact necessary police regulations controlling waterways and port facilities, to establish a general plan for harbor improvements, and "[t]o prescribe fines, forfeitures and penalties for the violation of any provision of any ordinance . . . ." (Stats. 1931, ch. 1028, § 6, p. 2144.) The district passed an ordinance prohibiting the construction of any tank or wharf within a specified area and providing that a violation thereof was a misdemeanor. Gilgert, an owner of land in the specified area, sought a judicial declaration of the invalidity of the act establishing the port district and the ordinance adopted by the district.

We held the state statute unconstitutional and voided the district's ordinance, finding that it was not " 'within the constitutional power of the Legislature . . . to confer upon a public corporation created for governmental purposes, the authority to enact local police regulations germane to the purposes for which the corporation has been created, and provide a penalty for the violation of such a regulation.' " (7 Cal.2d at p. 387.) Relying upon our decision in *Werner,* we stated: "For the purpose of local legislation certain functions may be conferred upon and exercised by various political subdivisions existing under our complex system of self-govern-

ment, but we cannot believe either the people or the Legislature intended to bestow upon such agencies the power to declare penalties for the violation of the many and varied rules and ordinances they might see fit to enact." (7 Cal.2d at pp. 390-391.) Finally, we summarized our holding as follows: "There is no doubt but what the Legislature has power to delegate to a port commission authority to make reasonable rules and regulations for the administration of any branch of the state's business pertinent to the functions of the commission or board, but no such board or commission may declare a violation of such rules or regulations, when so established, to be a crime." (7 Cal.2d at p. 392.)

Certain broad language in *Werner* and *Gilgert* appears to support the proposition that no power to make regulations having a local effect may be conferred upon public corporate bodies not enumerated in section 11. (See Brooks, *The Metropolis, Home Rule, and the Special District,* Part II (1960) 11 Hastings L.J. 246, 256-259.) However, *Werner* and *Gilgert* involved only the power to enact penal ordinances, and they have consistently been interpreted as forbidding only the delegation of power to prescribe penalties for violations of ordinances. (*Rible* v. *Hughes* (1944) 24 Cal.2d 437, 450 [150 P.2d 455, 154 A.L.R. 137] (Carter, J., dissenting); *L. B. Foster Co.* v. *County of Los Angeles* (1968) 265 Cal.App. 2d 24, 27-28 [71 Cal.Rptr. 16]; *Moore* v. *Municipal Court* (1959) 170 Cal.App.2d 548, 555-557 [339 P.2d 196]; 10 Ops.Cal.Atty.Gen. 47, 48-49 (1947); 16 Ops.Cal.Atty.Gen. 6, 8-9 (1950); 27 Ops.Cal.Atty.Gen. 134, 138 (1956) Peppin, *Municipal Home Rule in California: III* (1944) 32 Cal.L.Rev. 341, 358-360.) Thus in *Moore, supra,* the court said: "[W]e recognize that the Legislature may not delegate to a subordinate administrative body the power to promulgate rules and regulations coupled with the power to fix the penalty for their violation. The power to fix the penalty cannot be fragmentized without the danger that multiple administrative agencies may impose different sanctions for the same violation. The Legislature must retain the prerogative of the definition of the penalty because its distribution to various agencies could cause disparate and inequitable punishment for identical offenses. But so long as the Legislature determines the penalty it may leave the administrative body the actual making of the multiple rules called for by the specific subject matter regulated." (*Id.* at p. 556.)

The instant case is clearly distinguishable from *Werner* and *Gilgert* since the Legislature has not delegated to the Agency the power of enacting penal legislation. It is the Legislature itself which has properly declared that: "Violation of any ordinance of the agency is a misdemeanor." (§ 66801, art. VI, subd. (f).)

Nor has the Legislature, as it is claimed, granted to the Agency the same powers which have been granted to respondent counties by section 11. It is not necessary for us to consider the scope of the powers conferred on the counties by the Constitution or delegated to them by the Legislature; nor need we concern ourselves with the conflict, which has plagued the courts over the years, between decisions supporting a liberal, and those supporting a literal interpretation of section 11. (See Peppin, *supra,* 32 Cal.L.Rev. 341; 11 Cal.Jur.2d, Constitutional Law, § 126, pp. 491-494.) It is sufficient to point out that the powers exercised by respondents are for local purposes, within the limits of the county. But, as we have explained, the broad powers conferred upon the Agency are not for *local* purposes, but solely to achieve the *regional* goal of preserving the Lake Tahoe Basin— a goal which local bodies have been unable to attain. Indeed, the Compact specifically reserves to local entities matters within their proper sphere of action: "Whenever possible without diminishing the effectiveness of the . . . general plan, the ordinances, rules, regulations and policies [of the Agency] shall be confined to matters which are general and regional in application, leaving to the jurisdiction of the respective states, counties and cities the enactment of specific and local ordinances, rules, regulations and policies which conform to the . . . general plan." (§ 66801, art. VI, subd. (a).)

The counties argue that the powers of zoning and planning conferred on the Agency deal with matters which traditionally have been of exclusively local concern. (See Gov. Code, § 65800 et seq.) But such argument ignores the very language of the Compact. Section 66801, article VI, subdivision (a), which sets forth the Agency's powers, provides that the governing body shall adopt all necessary ordinances, rules and regulations "to effectuate the adopted *regional* and interim plans"; that all such ordinances, rules and regulations shall establish minimum standards "applicable *throughout the basin*"; that the regulations shall contain "*general, regional* standards" including "zoning"; and that the ordinances, rules and regulations shall be confined to matters "which are general and regional in application. . . ." (All italics added.) As we have already pointed out, section 66801, article V, which confers upon the Agency authority with respect to planning, clearly shows that such authority has to do with *regional* planning. It is beyond dispute, then, that the powers as to planning and zoning which the counties single out as violative of the Constitution are not powers local in nature and purpose.

Furthermore, problems which exhibit exclusively local characteristics at certain times in the life of a community, acquire larger dimensions and

changed characteristics at others.[18] "It is . . . settled that the constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate." (*Pac. Tel. & Tel. Co.* v. *City & County of S.F.* (1959) 51 Cal.2d 766, 771 [336 P.2d 514].) When the effects of change are felt beyond the point of its immediate impact,[19] it is fatuous to expect that controlling such change remains a local problem to be solved by local methods.[20] Old attitudes confer no irrevocable license to continue looking with unseeing eyes. The Compact gives the Agency power to adopt regional planning and regional zoning ordinances to solve regional problems of resource management; it does not delegate to the Agency the same powers granted to the counties.

In short, since the powers conferred upon the Agency are for regional purposes, not local purposes, and since no power to enact penal legislation has been delegated to the Agency, former section 11 is not violated and *Werner* and *Gilgert* are inapplicable.

## B

The counties next contend that the Compact legislation unconstitutionally imposes a tax on them in violation of former section 12 of article XI (now § 37 of art. XIII). Former section 12 provided: "Except as otherwise provided in this Constitution, the Legislature shall have no power to impose taxes upon counties, cities, towns or other public or municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such

---

[18]We do not, of course, say that planning and zoning are in all instances matters of more than local concern; we merely hold that under the instant facts they are of regional significance.

[19]See Heyman and Twiss, *Environmental Management of the Public Lands* (1971) 1 Ecology L.Q. 94, 96-105.

[20]Indeed, it has been generally recognized that land-use planning and environmental control often present problems of regional (Stevens, *Air Pollution and the Federal System* (1971) 22 Hastings L.J. 661, 662; Comment, *Preserving Rural Land Resources* (1971) 1 Ecology L.Q. 330, 367-371), statewide (Richard M. Nixon, First Annual Report to Congress on the State of the Nation's Environment (1971) U.S. Code Cong. and Admin. News 51, 59-60; S. 912 and H.R. 4332, 92d Cong., 1st Sess. (1971)), national (42 U.S.C. § 4331) or even world-wide concern (Kennan, *To Prevent a World Wasteland* (1971) 1 Environmental Affairs 191). The inability of local governments to deal with environmental problems stems not only from the obvious fact that the ecology is a seamless web not tailored to fit local political boundaries, but also from the economic impact of large-scale development; such as the placement of airports (Berger, *Nobody Loves an Airport* (1970) 43 So.Cal.L.Rev. 631) or freeway interchanges (Gov. Code, § 66400 et seq.).

purposes."[21] Pursuant to section 66801, article VII, subdivision (a), the counties must pay to the Agency the amounts of money allotted to them by the Agency to support its activities, which amounts the counties may raise by levying taxes on property within their jurisdiction. It is argued that contrary to the mandate of section 12, such taxes are imposed for "county . . . purposes," since the functions for which the Agency will spend the money "are those traditionally assumed by appropriate units of local government." The point of the argument is that the Legislature, although indirectly, is attempting "to impose taxes upon counties . . . for county . . . purposes."

■ Contrary to the above claim, we have held that "[t]he limitations of section 12 do not prevent the Legislature from authorizing a district to impose taxes for a state purpose (*Joint Highway Dist. No. 13* v. *Hinman,* 220 Cal. 578, 588 . . .), nor for a purpose that transcends the boundaries of the various municipalities that may be included within the limits of a larger district. (*Henshaw* v. *Foster,* 176 Cal. 507, 511 . . . ; *Pixley* v. *Saunders,* 168 Cal. 152 . . . .)" (*Santa Barbara etc. Agency* v. *All Persons* (1957) 47 Cal.2d 699, 708 [306 P.2d 875], revd. on other grounds (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174].)

■ Since, as has already been stated, the Compact was enacted to achieve regional goals in conserving the natural resources of the entire Lake Tahoe Basin, it is quite apparent that it does not offend former section 12. Although the Compact does provide that the *counties* may impose a tax upon taxable property to pay the sum allocated to them by the Agency (§ 66801, art. VII, subd. (a)), the provision cannot conflict with former section 12 since the funds are raised for *regional,* not for "county, city, town, or other municipal purposes . . . ."

## C

■ Finally, we consider the claim that the Compact violates former section 13 of article XI. That section provided: "The Legislature shall not delegate to any special commission, private corporation, company, association or individual any power to make, control, appropriate, supervise or in any way interfere with any county, city, town or municipal improvement, money, property, or effects, whether held in trust or otherwise, or to levy taxes or assessments or perform any municipal function what-

---

[21]In June 1970, former section 12, article XI was transferred to article XIII and renumbered as section 37. Otherwise, no change was made in its provisions. (See Cal. Const. Revision Com., Proposed Revisions of the California Constitution (1968) p. 80.) Since the Compact does not violate former section 12 of article XI, it does not violate present section 37 of article XIII.

ever. . . ."[22] The counties assert that the Agency is a "special commission" within the purview of the section and that the Legislature has unconstitutionally delegated to it the power to "interfere with" county improvements and to "perform" municipal functions. We find no merit in the contention.

"In the years preceding the adoption of section 13, the Legislature frequently intervened in local affairs through acts, for example, directing cities to pay the claims of designated individuals, issue bonds without voter approval, and levy taxes and spend money for various purposes. In addition, the Legislature appointed commissions free of local control with power over municipal indebtedness and taxation. Nonfiscal forms of interference also vexed the municipalities. Commissions created by the state legislature were given control of the fire department and other public works like streets and parks. The courts were slow to afford relief from such interference. During the Constitutional Convention of 1878 indignation at these highhanded legislative practices was vehemently expressed. Section 13 was the solution produced by the Convention for these abuses." (Fns. omitted.) (Comment, *San Francisco Bay: Regional Regulation for Its Protection and Development* (1967) 55 Cal.L.Rev. 728, 760-761.)

Although section 13 was intended primarily to prevent legislative interference with the financial affairs of municipalities, its prohibition extends to other forms of interference. (Comment, *supra,* 55 Cal.L.Rev. 728, 761; Peppin, *Municipal Home Rule in California: IV* (1946) 34 Cal.L.Rev. 644, 682-684.) However, our cases have recognized "that the section was intended to prohibit only legislation interfering with purely local matters. Special commissions have been upheld if they either fulfill a more than local purpose, under the 'larger municipality' doctrine, or promote a 'statewide purpose.' " (Fns. omitted.) (Comment, *supra,* 55 Cal.L.Rev. 728, 762.) Adverting to the section's prohibition on delegation of municipal functions to special commissions, we have observed that "it is clear that the whole object of the provision was to prevent the state legislature from interfering with local governments by the appointment of its own special commissions for the control of *purely local matters.*" (*In re Pfahler* (1906) 150 Cal. 71, 87 [88 P. 270].) (Italics added.)

---

[22]Present section 11 of article XI, which replaced former section 13 of that article, has been substantially amended. It no longer prohibits delegation of powers to "special commissions." Thus, the Constitution Revision Commission's comment on the new section 11 states: "This . . . Section prohibits delegation by the Legislature of certain powers over local matters. It restates the substance of related existing provisions without change in meaning except the proposal only prohibits delegation to private persons or bodies whereas the existing provision extends to 'special commissions.' " (Cal. Const. Revision Com., Proposed Revision of the California Constitution (1968) p. 65.) Since the Agency is a "special commission" and not a private person or body, it is obvious that the Compact cannot violate present section 11.

Similarly, it has been held that section 13 does not forbid delegation of the power to tax (*Pixley* v. *Saunders, supra,* 168 Cal. 152, 160; *Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 603 [9 Cal.Rptr. 431]) or to interfere with local public improvements (*People* v. *City of Los Angeles* (1960) 179 Cal.App.2d 558, 565-566 [4 Cal.Rptr. 531], app. dism. *sub. nom. Griffith* v. *California* (1960) 364 U.S. 476 [5 L.Ed.2d 221, 81 S.Ct. 243]) to accomplish purposes of more than purely local concern.

In upholding the establishment of sanitary districts we said: " '[W]hile generally the question of sanitation is a municipal affair, in many instances it is one of broader scope, which cannot be adequately handled by the municipal authorities of a single town. Therefore it cannot be said to be a "local" or "municipal" affair within the inhibition of sections 12 and 13 of the constitution . . . .' " (*Pixley* v. *Saunders, supra,* 168 Cal. 152, 160; see also *Doyle* v. *Jordan* (1926) 200 Cal. 170, 192 [252 P. 577]; *Dept. Pub. Health* v. *Board of Supervisors* (1959) 171 Cal.App.2d 99, 104-105 [339 P.2d 884].) Similarly, in *People* v. *City of Los Angeles, supra,* 179 Cal.App.2d 558, in upholding the State Highway Commission's condemnation of a portion of a city park, the court stated: "The commission fulfills a statewide purpose, not a local one; and its authority and functions are not *per se* an interference with municipal affairs even though, in properly exercising the state's inherent power of eminent domain the maintenance of a civic improvement or a municipal function may be impaired." (*Id.* at p. 566.)

In the case at bench, the Compact was enacted to serve regional, not merely local, purposes. Indeed, here, as with the sanitary districts in the *Pixley* case, one of the reasons for the establishment of the Agency was the inability of the myriad of local entities to cope with the problem of preserving the Tahoe Basin. The Compact does not give the Agency power to build or maintain local parks or other improvements; it merely grants the Agency authority to assure that public works which are planned, built and maintained by appropriate local bodies do not interfere with the fulfillment of the regional plan. Any restriction upon local improvements is merely incidental to the execution of the Agency's regional duties. Consequently, the Compact does not violate former section 13 of article XI of the California Constitution.

In summary, we find that the Agency has been created to serve a regional purpose in preserving rapidly deteriorating natural resources from imminent destruction. "The purpose is beneficent. [Under the Compact, the Agency] may accomplish that which it would be impossible for any one of the constituent municipal or suburban units to perform. Unless

grave constitutional reasons impel this court to the contrary, such an act will be upheld." (*Henshaw* v. *Foster, supra,* 176 Cal. 507, 511.) We do not find in former sections 11, 12, or 13 of article XI, or in their present counterparts (§§ 7 or 11 of art. XI or § 37 of art. XIII) any grounds to invalidate the Compact.

## III

The Counties of El Dorado and Placer also contend that the Compact is void because it denies their residents equal protection of the laws in violation of sections 11 and 21 of article I of the California Constitution[23] and of the Fourteenth Amendment to the United States Constitution. Such violation of equal protection is asserted on two separate grounds: (1) That the Compact by failing to provide therefor denies to the citizens of the Tahoe Basin their right of initiative, referendum and recall; and (2) that the method of selecting the governing body of the Agency violates the "one person, one vote" rule.

The counties' first argument is essentially this: Since the Legislature has provided for initiative, referendum and recall for *counties* but has made no such provision for the Agency, there is an unreasonable and arbitrary classification "[d]enying the citizens of the Tahoe Basin such basic rights . . . ." The point seems to be that although the citizens of El Dorado and Placer Counties *do* have such rights in respect to their counties, they are constitutionally entitled to an additional bundle of similar rights in respect to the Agency. We can discern no merit in this line of argument.

As we recently said, the concept of equal protection of the laws means simply "that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645].) So far as the procedures of the initiative, referendum and recall are concerned, the Agency is treated no differently than other districts in California. All districts, including regional agencies such as the present one, are excluded from the initiative, referendum and recall

---

[23] "California Constitution, article I, section 11, requires that 'All laws of a general nature shall have a uniform operation' and section 21 of the same article specifies that 'No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens.' These provisions of our state Constitution have been generally thought in California to be substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution." (*Dept. of Mental Hygiene* v. *Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321].)

provisions of the Elections Code where, as here, the district has been "formed under a law which does not provide a procedure for elections. . . ." (Elec. Code, § 5150.)[24] Since the residents of the Tahoe Basin are thus treated in the same way as those of other districts created under similar laws, they have suffered no denial of equal protection.

Nor can we discern any constitutional infirmity in the appointment, rather than the election of the governing body of the Agency. (See § 66801, art. III, subd. (a).) Certainly such a scheme of organization is not without precedent. (See, for example, the San Francisco Bay Conservation and Development Commission; Gov. Code, § 66620; see also Gov. Code, § 66400 et seq.; § 65063 et seq.; § 66500 et seq.) Indeed, in the instant case, the selection of the governing body by appointment would appear to be a necessary consequence of the interstate nature of the Agency. (See, *infra*, p. 506.)

The counties' "one person, one vote" argument is also lacking in merit. They urge that the Agency exercises "general governmental powers" and that, therefore, under *Avery* v. *Midland County* (1968) 390 U.S. 474 [20 L.Ed.2d 45, 88 S.Ct. 1114] and its progeny, the governing board of the Agency must be apportioned in a manner which conforms with the "one person, one vote" requirement of the Fourteenth Amendment.

Clearly, the members of the governing board of the Agency do not represent equal numbers of residents of the region. The United States census for 1970 gives the following populations for the counties here involved: Placer, 76,218; El Dorado, 41,704; Washoe, 119,965; Ormsby, 15,264; and Douglas, 6,046. Since one member of the Agency's governing board represents each of these counties some members of the board repre-

---

[24]Chapter 4 of division 4 of the Elections Code provides for initiative (art. 1), referendum and recall (art. 2) in connection with district elections. Section 5150.5 provides in relevant part: "For the purposes of initiative and referendum under this chapter, 'district' includes any regional agency which has the power . . . to regulate land use. . . ." Section 5150, found in article 1 provides in pertinent part: "In addition to any other method provided by law, ordinances may be enacted by any district pursuant to this article, except that the provisions of this article shall not apply to . . . a district formed under a law which does not provide a procedure for elections. . . ." Since the Compact provides no procedure for election, the provisions of article 1 of chapter 4, dealing with initiative measures, do not apply to the Agency. Section 5200 of the Elections Code found in article 2 provides: "The electors of any district . . . to which Section 5150 of this code applies, shall have the right to petition for referendum on legislative acts of such district. . . ." Section 5203 provides: "The right of recall may be exercised in any district to which Section 5200 applies. . . ." The *initiative* provisions for districts do not apply to the Agency because it was formed under a law which does not provide a procedure for elections (§ 5150). Therefore, the *referendum* and *recall* provisions for districts do not apply either (§§ 5200, 5203) since the applicability of section 5150 is a *sine qua non* of the applicability of sections 5200 and 5203.

sent far more residents than do others. Furthermore, the 11,998 residents of the City of South Lake Tahoe are, in a sense, represented twice, since both that city and El Dorado County within which it is located have a member on the Agency. Finally, the *ex officio* members and the members appointed by the governors do not represent residents at all, but rather "the public at large." If the Agency's governing board must be selected on a "one person, one vote" basis, it obviously fails the test. (See *Calderon* v. *City of Los Angeles* (1971) 4 Cal.3d 251 [93 Cal.Rptr. 361, 481 P.2d 489].)[25]

However, the members of the Agency's governing board are appointed, not elected. In *Sailors* v. *Board of Education* (1967) 387 U.S. 105 [18 L.Ed.2d 650, 87 S.Ct. 1549], the United States Supreme Court upheld a similar system of appointing members of a county school board over the objection that it violated the "one person, one vote" principle. There, the residents of each local school board district elected a local school board. Each of these boards, in turn, selected a delegate to a biennial meeting at which the delegates elected a five-member county board.

The court stated: "Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation. At least as respects non-legislative officers, a State can appoint local officials or elect them or combine the elective and appointive systems as was done here. . . . Since the choice of members of the county school board did not involve an election and since none was required for these nonlegislative offices, the principle of 'one man, one vote' has no relevancy." (387 U.S. at pp. 110-111 [18 L.Ed.2d at p. 655].)

Although *Sailors* was decided prior to *Avery*, it was cited with approval in the latter case and in *Hadley* v. *Junior College District* (1970) 397 U.S. 50 [25 L.Ed.2d 45, 90 S.Ct. 791]. *Sailors* represents the continuing view of the United States Supreme Court that "one person, one vote" applies to elected, but not to appointed, officials. Since the governing board of the Agency is filled by appointment, we think that "the principle of 'one man, one vote' has no relevancy" to this case.

The counties, however, contend that *Sailors* is distinguishable because

[25]The counties also contend that the Compact violates "one person, one vote" because only one supervisor from each county is a member of the Agency's governing board. They assert that the voters of supervisorial districts other than that from which the member supervisor was elected have no voice at all in the Agency. They also argue that residents of the region within the Agency's jurisdiction have their vote diluted by the votes of other citizens of the same county and supervisorial district who reside outside the boundaries of the Agency.

there the Supreme Court found that the school board "performs essentially administrative functions; and while they are important, they are not legislative in the classical sense." (Fn. omitted.) (387 U.S. at p. 110 [18 L.Ed.2d at pp. 654-655].) Here, as shown above, the Agency exercises a broad spectrum of powers of which some—for example, the enactment of ordinances to implement the regional plan—have normally been seen as legislative.

*Sailors* held that where *nonlegislative* offices are filled by appointment rather than by election, the "one person, one vote" principle is inapplicable, but expressly reserved the question as to whether apportionment would be required where *legislative* or *quasi-legislative* offices are filled by appointment. (387 U.S. at pp. 109-110 [18 L.Ed.2d at p. 654].) To the best of our knowledge, no reported decision has resolved that question, but some guidance can be gained from *Hadley* v. *Junior College District, supra,* 397 U.S. 50.

*Hadley* dealt with *elective* offices and held that "one person, one vote" applies to the election of school board officials. Rejecting the argument that "one person, one vote" was inapplicable because the school board exercised only administrative functions, the court stated: "Such a suggestion would leave courts with an equally unmanageable principle since governmental activities 'cannot easily be classified in the neat categories favored by civics texts'. . . ." (397 U.S. at pp. 55-56 [25 L.Ed.2d at p. 50].) Thus, with regard to *elective* offices, the court has refused to distinguish on the basis of the type of function performed by the officer.

We think that any administrative-legislative distinction in *appointive* offices should also be rejected. Surely, it is just as difficult to fit the governmental activities performed by appointed officers into neat categories, as it is to classify the functions of elected officials. This conclusion is fortified by the fact that the court in *Hadley* cites *Sailors* with approval, stating: "We have also held that where a State chooses to select members of an official body by appointment rather than election, and that choice itself does not offend the Constitution,[26] the fact that each official does not 'represent' the same number of people does not deny those people equal protection of the laws." (397 U.S. at p. 58 [25 L.Ed.2d at p. 52].) We think the true meaning of *Sailors* and *Hadley* is that the legislative or administrative nature of the activities performed by an officer is irrelevant; if the officer is elected, "one person, one vote" applies. If he is appointed, the principle does not apply.

---

[26]Under certain circumstances, not here present (see pp. 503-504, *ante*), the use of an appointive rather than an elective process may offend constitutional protections other than "one person, one vote."

The members of the Agency's governing board are appointed; consequently, the fact that they do not "represent" equal numbers of people does not deny those who are "underrepresented" equal protection of the laws.

Furthermore, we perceive significant state interests which justify the Compact's provisions for appointment of the Agency's governing board. In the first place, the Agency presents unique problems because of its inter-state nature. If the board were apportioned on the basis of population within the region, Nevada would be accorded more votes than California, since the population of Washoe, Ormsby and Douglas Counties is 141,275 whereas the population of El Dorado and Placer Counties is 117,922. California, whose concurrence was essential to the formation of the Agency, would be less interested in the Agency if its vote were less than equal to Nevada's. Secondly, persons not residing within the Tahoe Basin have a very real and direct interest in the actions of the Agency. Aside from the general interest of the people of this state, including its vacationers, in the preservation of Lake Tahoe, it is common knowledge that many nonresidents own vacation homes and other property within the region. They will, of course, be directly affected by any planning or zoning by the Agency. Finally, the Compact represents an innovative attempt to deal with a problem directly affecting nonresidents of the Tahoe Basin, as well as residents. The Compact gives to the residents of the region a clear majority of the representation on the governing board, since such residents are the persons most intimately involved with the Agency. Yet, as we have seen, the general population of the state has a very substantial, if lesser, interest in the Agency. The public at large is represented by the two members sitting *ex officio* and by the two members appointed by the governors.

As the United States Supreme Court has said: "The *Sailors* and *Dusch* [*Dusch* v. *Davis* (1967) 387 U.S. 112 (18 L.Ed.2d 656, 87 S.Ct. 1554)] cases demonstrate that the Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local government. We will not bar what Professor Wood has called 'the emergence of a new ideology and structure of public bodies, equipped with new capacities and motivations . . . .'" (*Avery* v. *Midland County, supra*, 390 U.S. 474, 485 [20 L.Ed.2d 45, 54].) The Compact, imbued with the new ideology of environmental protection, has fashioned for the Agency a structure and machinery designed to deal with the special problems threatening the area. We find nothing in the concept of equal protection of the laws which forbids such a commendable effort.

## IV

The counties' final contention is that the Compact is an unlawful delegation of legislative powers to an administrative agency in that the broad authority given the Agency to adopt a regional plan is not "channeled by a sufficient standard."

The doctrine prohibiting delegations of legislative power is not violated if the Legislature makes the fundamental policy decisions and leaves to some other body, public or private, the task of achieving the goals envisioned in the legislation. (*Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 375-377 [71 Cal.Rptr. 687, 445 P.2d 303].) Here, three Legislatures have jointly determined the goals which the Agency is to achieve. Article I of the Compact sets forth the aims which the Agency is to promote; article V specifies that those ends are to be achieved primarily through the formulation and enforcement of a regional plan having certain prescribed and correlated elements. Finally, the powers specified in article VI are conferred "to effectuate the adopted regional . . . ." plan. Where the Legislature has so carefully set forth its decision on the basic policy issues, it surely may delegate the duty of carrying out its command to an administrative body such as the Agency.

## V

We, therefore, reach these final conclusions: Section 66801 of the Government Code, which constitutes the enactment by the California Legislature of the Tahoe Regional Planning Compact, is constitutional. The Compact imposes on respondent counties a clear and present duty to pay to the Tahoe Regional Planning Agency the sums heretofore and hereafter allotted to them by the Agency as representing their respective shares of the amount of money necessary to support the Agency's activities. Respondents have consistently failed and refused to perform their duty enjoined on them by said law. The performance of respondents' duty properly can and should be compelled by issuance of a peremptory writ of mandate.

The counties attempt to excuse their noncompliance by asserting that no proper demand for payment was ever made on them. We cannot find in the Compact any requirement for such a demand. Rather, the Compact provides that the Agency shall adopt a budget and apportion the necessary funds among the counties. Thereafter, "[e]ach county in California shall pay the sum allotted to it by the agency . . . ." (§ 66801, art. VII, subd. (a).) The Agency has properly adopted its budget and allocated it among the counties; the counties' duty to pay has matured.

Indeed, any demand for payment would be a superfluous act. One member of the board of supervisors of each respondent county sits on the governing board of the Agency. It is the governing board which adopts the Agency's budget and apportions it among the counties. Thus, respondent counties have a built-in line of communication by which they automatically receive notice of their allotted share in an easy, rapid and reliable manner.

Let a peremptory writ of mandate issue as prayed.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Schauer, J.,* and Devine, J.,† concurred.

0

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.