John A. GRIVETTI, Jr., et al.

v.

ILLINOIS STATE ELECTORAL BOARD et al.

INDEPENDENT VOTERS OF ILLINOIS et al.

v.

John W. LEWIS et al.

VILLAGE OF ARLINGTON HEIGHTS et al.

v.

John W. LEWIS et al.

VILLAGE OF OAK PARK et al.

v.

John W. LEWIS et al.

CITY OF EVANSTON et al.

v.

John W. LEWIS et al.

VILLAGE OF SKOKIE et al.

v.

John W. LEWIS et al.

Nos. 71 C 1955, 71 C 2056, 71 C 2203, 71 C 2245, 71 C 2392, 71 C 2497.

United States District Court, N. D. Illinois, E. D.

Dec. 10, 1971.

Jack M. Siegel, Chicago, Ill., for Village of Arlington Heights and City of Evanston.

John A. Grivetti, Jr., Peru, Ill., pro se.

Arthur C. Thorpe, Chicago, Ill., for Village of Oak Park.

Harvey Schwartz, Skokie, Ill., for Village of Skokie.

Edgar Bernhard, Joseph R. Lundy, Chicago, Ill., for Independent Voters of Ill.

William J. Scott, Atty. Gen. of Ill., by Robert A. Tingler, Asst. Atty. Gen. of Ill., Chicago, Ill., for defendant.

Jerome H. Torshen, Chicago, Ill., for Ill. Redistricting Comm.

Peter Fitzpatrick, Chicago, Ill., for Alan Dixon, Treasurer, Michael Howlett, Auditor of Public Accounts, James Ronan, Ill. State Chairman, Democratic Party, all as ex officio members of the Ill. State Electoral Bd.

Before SPRECHER, Circuit Judge, and AUSTIN and NAPOLI, District Judges.

SPRECHER, Circuit Judge.

These six consolidated cases prayed for the convening of a three-judge court under 28 U.S.C. §§ 2281 and 2284 for the purpose of (1) holding either that Article IV, section 3(b) of the 1970 Constitution of the State of Illinois, S.H.A., providing for the appointment of a legislative redistricting commission, is unconstitutional or that the commission appointed thereunder is without constitutional authority to redistrict or that the redistricting plan adopted by the commission fails to meet federal constitutional standards; (2) enjoining elections of members of the Illinois general assembly under the commission plan; and (3) drawing of a new map by this court.

## LEGISLATIVE REDISTRICTING BY COMMISSION

On December 15, 1970, the people of the State of Illinois adopted a new constitution providing that the legislative power of the state is vested in a general assembly consisting of a senate and house of representatives elected from 59 legislative districts, one senator for a four-year term and three representatives for two-year terms to be elected from each legislative district (Art. IV, §§ 1, 2 (a) and 2(b)).

The Constitution of 1970 provides that legislative districts shall be compact, contiguous and substantially equal in population (Art. IV, § 3(a)).

In the year following each federal decennial census year, the general assembly shall redistrict the legislative districts, but if it fails to do so by June 30, a legislative redistricting commission shall be constituted not later than July 10, consisting of eight members, no more than four being of the same political party. The speaker and minority leader of the house of representatives shall each appoint one representative and one person who is not a member of the general assembly. The president and minority leader of the senate shall each appoint one senator and one non-legislator (Art. IV, § 3(b)).

Not later than August 10, the Legislative Redistricting Commission shall file with the Secretary of State of Illinois a redistricting plan approved by at least five members (Art. IV, § 3(b)).

A federal census was duly taken in the decennial census year of 1970.

Section 3 of Article IV of the 1970 Constitution, which provides for legislative redistricting, became effective January 15, 1971 (Transition Schedule, § 10). The Transition Schedule provided further: "For purposes of appointing members of a Legislative Redistricting Commission in 1971, the President Pro Tempore of the Senate shall have the appointing power vested by Section 3(b) of Article IV in the President of the Senate."

The Illinois General Assembly failed to redistrict the state legislative districts by June 30, 1971.

On July 9, 1971, W. Robert Blair, the Speaker of the House of Representatives, appointed to the Legislative Redistricting Commission himself and J. Douglas

Donenfeld as a non-legislative member; Clyde L. Choate, the minority leader of the House of Representatives, appointed himself and Douglas N. Kane as a non-legislative member; Cecil A. Partee, the President Pro Tempore of the Senate, appointed himself and Herman G. Bodewes as a non-legislative member; and W. Russell Arrington, the minority leader of the Senate, appointed state Senator Terrel E. Clarke and William G. Stratton as a non-legislative member.

On August 7, 1971, the Legislative Redistricting Commission filed a redistricting plan (August 7 plan), describing the 59 districts in terms of counties, townships, cities and villages where those boundaries were used, in terms of legal descriptions in some instances, and, particularly in Cook County and other heavily populated counties in the metropolitan Chicago area, in terms of "census tracts," "block groups" and "enumeration districts" as those terms are defined in the 1970 census of population. The August 7 plan was duly filed with the Secretary of State as approved by six of the eight members of the commission, members Clarke and Stratton not approving.

### THE PLAINTIFFS AND THEIR CONTENTIONS

The complaint in No. 71 C 1955 was filed on August 9, 1971, by John A. Grivetti, Jr., a resident of the State of Illinois, as a class action on behalf of himself and all other Illinois residents, challenging the August 7 plan as violating the Fourteenth Amendment to the Constitution of the United States by containing districts which are not compact, contiguous or representative of a "genuine community of interest," which are grossly misshapen and "appear to be classic cases of gerrymandering" and which were drawn "without proper consideration of traditional political boundaries."

The complaint in No. 71 C 2056 was filed on August 23, 1971, by Independent Voters of Illinois (IVI), a voluntary state-wide association of Illinois voters, by an individual independent voter who is also a former and prospective independent candidate for elective public office suing on behalf of himself and all prospective independent candidates, and by an individual independent voter suing on behalf of himself and all independent voters and voter-supporters of independent candidates for public office. IVI challenged the August 7 plan on the ground that Article IV, section 3(b) of the 1970 Constitution is unconstitutional in that it creates a legislative redistricting commission controlled by the two major political parties and favors voters and elected officials affiliated with those two parties contrary to the Fourteenth Amendment and places a premium on major party affiliation contrary to the First Amendment.

Upon oral argument before this court, IVI's counsel explained that IVI contends principally that the Illinois constitutional provision is invalid as a federally unconstitutional delegation of legislative power to the redistricting commission.

The remaining four complaints, filed by four municipal corporations established under Illinois law and performing governmental functions, challenged the August 7 plan on grounds substantially common to all.

The complaint in No. 71 C 2203 was filed on September 8, 1971, by the Village of Arlington Heights, by the president and village trustees and by a member of the Sixth Constitutional Convention which adopted the proposed 1970 Constitution, all residents of Arlington Heights and voters, suing on behalf of themselves as officials and individuals and on behalf of all residents of Arlington Heights.

The complaint in No. 71 C 2245 was filed on September 13 by the Village of Oak Park and by the president and village trustees, all residents of Oak Park and voters, suing as officials and individuals and on behalf of all residents of Oak Park.

The complaint in No. 71 C 2392 was filed on October 4 by the City of Evanston, by the mayor and aldermen and by the Republican and Democratic township committeemen for Evanston Township, all residents of Evanston and voters, suing as officials and individuals and on behalf of all residents of Evanston.

The complaint in No. 71 C 2497 was filed on October 18 by the Village of Skokie and by the president, clerk and village trustees, all residents of Skokie and voters, suing as officials and individuals and on behalf of all residents of Skokie.

The 1970 federal census of population shows that the population of Evanston is 79,808; of Skokie, 68,627; of Arlington Heights, 64,884; and of Oak Park, 62,511. Since the 1970 population of the State of Illinois is 11,113,976, the average population of each of 59 legislative districts would be 188,372 persons. Inasmuch as each of the four municipalities would comfortably fit within the population limits of an average legislative district, the municipalities' chief complaint against the August 7 plan was that each has been so chopped up that Arlington Heights finds itself in four separate legislative districts, Skokie and Oak Park are in three separate districts and Evanston is in two districts.

The municipalities pointed out that under the 1970 Constitution each is a home rule unit (a municipality with more than 25,000 population) entitled to exercise a wide range of broad powers and functions, to regulate for the protection of public health, safety, morals and welfare, to license for regulatory purposes, to tax and to incur debt, all as set forth in Article VII, section 6, of the Constitution.

Additionally, elections in Oak Park and Skokie are traditionally held on a non-partisan basis. The same boundary lines delineate not only the Village of Oak Park but also the Township of Oak Park, the Park District of Oak Park and School District Number 97. The same boundary lines delineate not only the Village of Skokie but also the Skokie Public Library and the Skokie Park District.

The municipalities further alleged that extensive gerrymandering was required to divide them into separate districts, that the resultant districts were not compact nor representative of communities of interest, that the municipalities' respective electorates were diminished and diluted, that traditional political boundary lines were ignored, that the common interests of municipal citizenry were rendered impotent, that the motive behind the August 7 plan was to perpetuate incumbent members of the Illinois General Assembly in office, and that these facts severally and collectively violate the First and Fourteenth Amendments.

The municipalities also charged that the legislative districts in the August 7 plan are not contiguous as required by the Illinois Constitution nor equal in population as required by the Illinois and federal constitutions.

They further charged that the appointment of Messrs. Blair, Choate, Partee, Donenfeld, Kane and Bodewes (the six members of the Legislative Redistricting Commission who approved the August 7 plan) violated the Illinois Constitution since Blair, Choate and Partee were not authorized to appoint themselves and since Donenfeld, Kane and Bodewes were the respective legislative aids of Blair, Choate and Partee, were employees of the General Assembly and were alter egos of the persons who appointed them.

The municipalities, as well as IVI, further charged that the creation of the Legislative Redistricting Commission violates the Fourteenth Amendment because its members were appointed without regard for one-man-one-vote principles. The municipalities also charged, as did IVI, that the commission is necessarily dominated by Republicans and Democrats to the exclusion of independent voters and in violation of their rights. Oak Park also alleged that the creation of the commission was an in-

valid delegation of legislative power without guiding standards.

## THE DEFENDANTS AND THEIR PRELIMINARY MOTIONS

In regard to defendants, the Grivetti complaint is directed against the State Electoral Board of the State of Illinois; the IVI complaint against John W. Lewis, Secretary of State of Illinois; the Oak Park complaint against the Electoral Board and Lewis; and the Arlington Heights, Evanston and Skokie complaints against the Electoral Board, Lewis and William J. Scott, Attorney General of Illinois.

The Electoral Board, consisting of the Governor, Secretary of State, Attorney General, State Treasurer, Auditor of Public Accounts and the chairmen of the state central committees of the two leading political parties, is responsible for certifying the names of candidates for the General Assembly prior to their appearance on the ballot and has other duties in regard to the election. The Secretary of State is charged under Article IV, section 3 of the 1970 Constitution with receiving the plan adopted by the Legislative Redistricting Commission. The Attorney General is charged under the Constitution with initiating redistricting actions in the name of the People of Illinois before the Illinois Supreme Court.

Subsequent to the filing of the six complaints herein, this court granted leave to intervene to Alan J. Dixon, the State Treasurer, Michael J. Howlett, Auditor of Public Accounts and James A. Ronan, the chairman of the Democratic State Central Committee, and to the Illinois Legislative Redistricting Commission.

The Attorney General, appearing on behalf of the Electoral Board, Secretary of State and himself, moved to dismiss the six complaints on the grounds that they (1) failed to state a cause of action; (2) failed to allege damages sufficient to present a justiciable case; (3) failed to present a class action; (4) prayed for impossible relief inasmuch as the Legislative Redistricting Commission cannot represent every special interest group; and on the grounds that (5) the Illinois Constitution expressly provides for the creation of the commission; (6) the federal court cannot assume a state legislative role; (7) an action does not lie against Lewis individually; (8) the commission and its members are necessary parties; as to IVI (9) it is a voluntary association lacking standing to sue; and as to Grivetti (10) he lacks standing to sue and (11) he does not allege how the August 7 plan violates his constitutional rights.

The plaintiffs in all six causes and the Attorney General filed written briefs addressed to the motions to dismiss and to the consideration of preliminary relief.

The intervening State Treasurer, Auditor of Public Accounts and Democratic Chairman (Dixon Group) also moved to dismiss the complaints, including some of the Attorney General's grounds and additionally that (1) plaintiffs failed to allege population or other factors creating a federal case or controversy; (2) plaintiffs failed to join as indispensable parties the members of the Electoral Board; (3) neither municipalities nor their officers are "persons" under 42 U.S.C. § 1983; and (4) the complaints do not present issues proper for a three-judge court.

The Dixon Group and the Legislative Redistricting Commission advised this court that a separate original cause of action brought in the name of the People of the State of Illinois against all of the parties in the six causes of action before this court was filed in the Supreme Court of Illinois on October 26, 1971 and was orally argued before that court on November 9, 1971. In view of these developments, the Dixon Group and the commission moved that this court stay these actions or abstain from acting pending action by the Illinois Supreme Court.

All of the motions to dismiss and to stay or abstain, as well as an IVI motion for a preliminary injunction and

an Evanston motion for a temporary restraining order, were heard by this court on November 12, 1971. In addition to hearing oral arguments by all parties before this court, duly certified copies of various public documents including the August 7 plan were received in evidence. On November 15, this court entered an order requiring the filing by the commission of certified copies of a map and population figures for the 59 districts resulting from the August 7 plan. All parties were given additional time to file counteraffidavits challenging any of the certified documents filed or to be filed by the commission.

Some of the parties urged at the time of oral argument that enough facts were uncontroverted in order for this court to render at least partial summary judgment.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM

### I

The threshold question in view of the parallel consideration of identical issues by the Illinois Supreme Court is abstention, which one writer has aptly defined as "a matter of finding some place to hide when faced with a difficult issue." [1]

The six cases were filed in this court during the period August 9 through October 18, 1971. The Illinois Supreme Court granted leave on October 26, 1971 for the filing of "An Original Proceeding Concerning Redistricting the Illinois House and Senate," brought in the name of the People of the State of Illinois by private attorneys, one of whom represents the Dixon Group before this court.

The Illinois court gave the Attorney General of Illinois the opportunity to be substituted as relator for the People on or before November 1, 1971, undoubtedly because of the 1970 Constitution provision that "[t]he Supreme Court [of Illinois] shall have original and exclusive jurisdiction over actions concerning redistricting the House and Senate which shall be initiated in the name of the People of the State of Illinois by the Attorney General" (Art. IV, § 3(b), para. 10).

We have been advised that the Illinois Attorney General did elect to be substituted as relator and that the issues presented to this court were argued by all the same parties on November 9, 1971 before the Illinois Supreme Court, which indicated at that time an expeditious consideration and determination.

In Forty-Fourth General Assembly v. Lucas, 379 U.S. 693, 85 S.Ct. 715, 13 L.Ed.2d 699 (1965), the United States Supreme Court required a three-judge court in a legislative reapportionment case (232 F.Supp. 797 (D.Colo.1964)) to refrain from deciding issues of purely state law where a state court indicates its intention expeditiously to resolve such issues. In earlier phases of Illinois legislative redistricting, the Supreme Court held in Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 1527, 14 L.Ed.2d 477 (1965): "The case is remanded with directions that the District Court enter an order fixing a reasonable time within which the appropriate agencies of the State of Illinois, including its Supreme Court, may validly redistrict the Illinois State Senate. . . ." [2]

Absent the state court proceeding, there would be no question concern-

1. Dixon, Democratic Representation: Reapportionment In Law and Politics 228 (1968).

2. That the coin has another side was indicated in Davis v. Mann, 377 U.S. 678, at 690–91, 84 S.Ct. 1441, at 1447, 12 L.Ed.2d 609 (1964), where the Supreme Court said in a state legislative reapportionment case:
   "Where a federal court's jurisdiction is properly invoked, and the relevant state constitutional and statutory provisions are plain and unambiguous, there is no necessity for the federal court to abstain pending determination of the state law questions in a state court. McNeese v. Board of Education, 373 U.S. 668 [83 S.Ct. 1433, 10 L.Ed.2d 622]. This is especially so where, as here, no state proceeding had been instituted or was pending when the District Court's jurisdiction was invoked."

ing our jurisdiction since once federal jurisdiction is present as here (Baker v. Carr, 369 U.S. 186, 198–204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)), the federal courts resolve federal constitutional questions even when they are "enmeshed with state law questions." Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Here the state court heard the same issues a few days before we did in a case instituted somewhat later than the federal cases. We do not believe that the resolution of these important matters should depend upon stop-watch considerations but rather upon the quality of expertise available to the parties in the course of the prompt disposition under time limitations of issues of great and abiding concern. The redistricting with which we are concerned may be effective for a lengthy period; yet we must act in regard to it prior to December 13, 1971, the first day for the filing of petitions of candidacy by potential candidates affected by the reapportionment.

Faced with this situation, we believe that the Illinois Supreme Court is better qualified than we to resolve the Illinois constitutional questions and that we cannot avoid resolving the federal constitutional questions. We agree with the unanimous opinion of the Supreme Court of the United States in Reetz v. Bozanich, 397 U.S. 82 at 86–87, 90 S.Ct. 788 at 790, 25 L.Ed.2d 68 (1970):

"We are advised that the provisions of the Alaska Constitution at issue have never been interpreted by an Alaska court . . . The three-judge panel was a distinguished one, two being former Alaska lawyers. And they felt that prompt decision was necessary to avoid the 'grave and irreparable' injury to the 'economic livelihood' of the appellees which would result, if they could not engage in their occupation 'during this year's forthcoming fishing season.'

". . . A state court decision here, however, could conceivably avoid any decision under the Fourteenth Amendment and would avoid any pos-

sible irritant in the federal-state relationship.

". . . [W]e have concluded that the first judicial application of these constitutional provisions should properly be by an Alaska court.

"We think the federal court should have stayed its hand while the parties repaired to the state courts for a resolution of their state constitutional questions."

Here certain provisions of the 1970 Illinois Constitution are to be construed for the first time; the resolution of the state constitutional issues by the state supreme court will not involve protracted waiting or delay. The state issues include (1) the meaning and present application of "compact" and "contiguous" districts under Article IV, section 3(a); (2) whether the provisions for the appointment of a legislative redistricting commission in Article IV, section 3(b) are in conflict with the separation-of-powers provisions of Article II, section 1 or with the vesting of legislative power in a general assembly by Article IV, section 1; (3) whether the members of the 1971 Legislative Redistricting Commission were properly appointed in accordance with Article IV, section 3(b); and (4) whether any of the other allegations by plaintiffs result in finding the August 7 plan offensive under the 1970 Illinois Constitution.

To the extent that the issues before us involve Illinois constitutional questions, we abstain in order for the Supreme Court of Illinois to decide those issues.

To the extent that we are confronted with federal constitutional questions, we proceed to consider them.

In so doing we deem it appropriate to note that Chief Justice Underwood of that court and the author of this opinion, with the full knowledge and approval of all of the members of both courts, have heretofore conferred regarding a joint resolution of the federal constitutional questions involved in these cases. Both courts agree that neither the procedures involved in formulating the redistrict-

ing plan, nor the plan itself, contravene federal constitutional provisions. Our reasons for this conclusion are hereinafter set forth.

## II

■ In regard to the federal constitutional questions, the plaintiffs have clearly stated a claim upon which relief can be granted insofar as they have placed in issue the question of substantially equal population for the 59 legislative districts. "The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races." Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964).

While most of the plaintiffs referred in a general way to population disparity, the Evanston plaintiffs specifically alleged substantial disparity between Districts 2 and 3.

The Legislative Redistricting Commission filed its August 7 plan mainly in terms of counties, townships, cities and villages in the less populous areas of the state but in Cook County and the metropolitan Chicago area principally in terms of census tracts and with some legal descriptions.

On November 5, 1971, the commission filed with the Secretary of State "notice of correction of typographical errors" in the August 7 plan, making corrections in four of the 59 districts, namely District Nos. 2, 3, 32 and 33. This court has carefully examined the original plan as it pertains to these districts, has compared the original descriptions with the corrected descriptions and concludes that the four corrections were bona fide "typographical errors" and not post-plan attempts to cure the disparity first disclosed by the Evanston plaintiffs. This conclusion is buttressed by the fact that the August 7 plan resulted in near-absolute population equality for the uncorrected 55 districts and, after correction, the remaining four districts fit closely into the same pattern.

The plaintiffs had just complaint in criticizing the commission for failure promptly to make the corrections or expeditiously to produce an actual map, exact legal descriptions of the districts and district population figures based on the August 7 plan. The court was subsequently furnished by the commission with certified copies of (1) legal descriptions, representing a conversion from census tract boundaries, of all districts, making them more readily identifiable, which descriptions were filed with the Secretary of State on November 9, 1971; (2) population figures for each district filed with the Secretary of State on November 17, 1971; (3) a map showing the 30 legislative districts in or including a part of Cook County; and (4) a map showing the 29 districts in the balance of the state.

The population figures now officially filed have not been challenged. They indicate a scrupulous regard for equality of population as required by federal constitutional standards and coincidentally by the Illinois constitutional provision that legislative districts "shall be . . substantially equal in population" (Art. IV, § 3(a)).

■ An average district would contain 188,372 persons. The largest district in the August 7 plan contains 189,-905 persons, a percentage deviation of 0.81 percent. The smallest district contains 187,310 persons, a percentage deviation of 0.56 percent. The range deviation is 1.37 percent. Professor Dixon in his comprehensive analysis of the Supreme Court reapportionment cases following Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), concluded (Democratic Representation, at 446): "For that matter, if special 'justification' cannot be shown there is no reason in terms of districting mechanics for permitting maximum deviations of one percent (or 'ranges' of two percent)." The August 7 plan conforms to those strict population-equality standards.

On the basis of population, the August 7 plan is constitutional by federal

standards. Since the plaintiffs were given the opportunity to file opposing affidavits in regard to population and the certified figures were not challenged, there is no genuine issue as to the material population facts. Following the procedures of Rules 12(b) (6) and 56, Fed.R.Civ.P., we find the defendants are entitled to a partial summary judgment on that issue.

### III

There remains for consideration whether the plaintiffs have stated any other claim for relief which, if proved, would render the August 7 plan federally unconstitutional.

Undoubtedly the most appealing and facially logical argument is that, in the context of the four municipalities' complaints, their cohesive electorates have been splintered and somehow partially disenfranchised by the ignoring of traditional political boundaries, and, in the context of the IVI complaint, that independent voters have been disenfranchised. The two concepts are distinct but their analysis depends to a certain extent upon common history, principles and cases.

In Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), a state (Florida) legislative reapportionment case, the Court held that no population deviations other than de minimis deviations are permissible unless special justification "grounded on acceptable state policy" be shown.

Professor Dixon has commented (Democratic Representation, at 446): "De minimis deviations in district population equality always can be brought to near-zero simply by ignoring traditional political subdivision lines and using census tracts as the sole building blocks for legislative districts. Further, it is difficult to articulate community of interest factors with any precision as possible justifications for particular deviations, even if such factors are included within the Court's undefined 'acceptable state policy' phrase."

In Kilgarlin v. Hill, 386 U.S. 120, 122–23, 87 S.Ct. 820, 822, 17 L.Ed.2d 771 (1967), the Court overruled a district court's upholding of a Texas legislative reapportionment plan with significant population deviations although the state plan was found by the district court to be "a bona fide attempt to conform to the state policy requiring legislative apportionment plans to respect county boundaries whenever possible."

Near-absolute equality was demanded in the two Congressional redistricting cases of Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). In *Kirkpatrick,* the Court said at 533 of 394 U.S., at 1230 of 89 S.Ct.:

"Missouri contends that variances were necessary to avoid fragmenting areas with distinct economic and social interests and thereby diluting the effective representation of those interests in Congress. But to accept population variances, large or small, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people."

The most recent reapportionment cases are Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). Mr. Justice Douglas in his dissent in *Whitcomb* characterizes the Court's opinion as approving, in effect, racial gerrymandering and perforce "gerrymandering of any special interest group . . . whether it be social, economic, or ideological." In any event it is clear that the majority of the Court set aside the monumental work of the three-judge court in drafting a court plan, principally on the ground that the court "intruded upon state policy" and because "[h]ere the District Court erred in so broadly brushing aside state apportionment policy without solid constitutional or equitable grounds for doing so."

The Supreme Court cases from *Swann* to the present time point to a consistent majority principle despite the prolificacy of concurring and dissenting opinions and the prodigious volume of thought expressed by the Court: Near-absolute equality of population must be observed in legislative redistricting unless the state can justify deviations from equality for some compelling reason of state policy; even then the justified deviations must be relatively small. In the present cases, we are confronted with a state plan with near-perfect equality. The state is not seeking to justify any deviations, but citizens in the state are seeking to nullify state policy as reflected in the adopted plan and to substitute a court-drafted plan. Of the myriad of court-drawn plans, seemingly without exception they result only (1) when there is no state plan proffered by the state legislature or some state agency or (2) when a state-promulgated plan violates population equality. Even then the court-drawn plan may not pass Supreme Court muster, as in *Whitcomb*. In the present state of federal reapportionment law, it is inconceivable that a state-sponsored plan with near-absolute equality could be considered constitutionally infirm, with the possible exception of one incorporating flagrant racial gerrymandering (Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)). No racial inequality is alleged in any of the complaints here.

Not only has the State of Illinois demonstrated its apportionment policy by adopting the August 7 plan, but a search of the proceedings of the recent Illinois constitutional convention shows that the convention considered and rejected county and municipal boundaries for redistricting when adopting the Constitution itself.

The *Abate* case appears to afford some small comfort to the municipalities by saying that "a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality." 403 U.S. at 185, 91 S.Ct. at 1907. But that case dealt with one county, the legislative body of which was traditionally composed of the supervisors of each of the county's five constituent towns, all of the supervisors acting *ex officio* on the county board. There the county itself sought to justify the population deviations and was successful. The Supreme Court carefully distinguishes that case from Congressional and state legislative cases. And finally, here the state has presented a population-pure map and is not seeking to justify any deviations.

The *Whitcomb* case also appears to dispose of the claim that independent voters have been disenfranchised here so long as the population numbers prove out. The real IVI complaint, however, is that the delegation of the "legislative" power of reapportionment to a commission is federally impermissible.

Professor Cooper has pointed out, citing many cases (1 State Administrative Law 45 (1965)):

> "The federal constitution does not require the several states to observe in their internal organization the limitations imposed by the separation of powers doctrine. Neither the provision of article IV, section 4, of the federal constitution, providing that the United States shall guarantee to every state a republican form of government, nor the fourteenth amendment, has been held to necessitate a rigid separation of powers.

> "The separation of powers doctrine . . . affords an obstacle to delegation of power to state agencies only insofar as the constitution of a particular state may require such separation." (footnotes omitted)

Some of the other plaintiffs contend that the appointment of the members of the commission is federally invalid since one-man-one-vote principles are ignored by such appointment.

■ The Supreme Court has held that a state may appoint officials of a non-legislative nature without violating the equal protection clause. Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct.

1549, 18 L.Ed.2d 650 (1967). The only limitation is that the choice to appoint may not in itself offend the constitution. Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

Some lower courts faced with this problem have relied on a characterization of the agency. One-man-one-vote was not applied to a state bar's board of commissioners, because the board's powers were mainly "judicial." Sullivan v. Alabama State Bar, 295 F.Supp. 1216 (M.D.Ala.1969). In an opinion with a narrow, procedural holding but a broad tone, the Second Circuit intimated that the appointive Board of Elections of New York City must be made representative because of its legislative functions. Weiss v. Duberstein, 445 F.2d 1297 (1971). Another court relied on both the legislative powers and the elective nature of the "Quarterly County Court" to apply one-man-one-vote. Hyden v. Baker, 286 F.Supp. 475 (M.D. Tenn.1968).

Other courts have refused to apply the principle to appointive bodies. Irish v. Democratic-Farmer-Labor Party, 399 F. 2d 119 (8th Cir. 1968); People ex rel. Younger v. El Dorado County, 5 Cal.3d 480, 96 Cal.Rptr. 553, 487 P.2d 1193 (1971). The court in the latter case stated: "We think that any administrative-legislative distinction in appointive offices should . . . be rejected. * * * We think the true meaning of Sailors and Hadley is that the legislative or administrative nature of the activities performed by an officer is irrelevant; if the officer is elected, 'one person, one vote' applies. If he is appointed, the principle does not apply." 96 Cal.Rptr. at 569, 487 P.2d at 1209.

Because the redistricting commission is appointive and exercises a specialized legislative function, and does that only when the legislature chooses to default, the challenges to the federal validity of the Illinois Redistricting Commission must fail. A variant of the challenges might be based on the clause in Article IV, section 4, of the federal constitution that every state is guaranteed a republican form of government. Whether a republican form of government requires redistricting to be performed by the legislature, however, is the kind of question declared "political" in Luther v. Borden, 48 U.S. 1, 7 How. 1, 12 L.Ed. 581 (1849).

Even if it is considered that the reapportionment function is wholly legislative, the discretion of the commission is restricted by the standards enforced by the courts since Reynolds v. Sims, as well as by the standards set by the Illinois Constitution.

In reaching this conclusion, we are persuaded particularly by the fact that about one-third of the states have assigned legislative reapportionment outright to administrative agencies or commissions. About one-half of these states have removed the apportionment function completely from the legislature and the remaining states provide, as does Illinois, for use of the commission as a backstop in the event of legislative failure to redistrict.[3] We have discovered no successful attempt to invalidate any of these agencies, either on the basis of unconstitutional delegation of power or violation of one-man-one-vote principles. Furthermore, between 1901 and 1971, the Illinois General Assembly has come forward with only one legislative redistricting map under which an election has been held.[4] For 70 years and

---

3. Dixon, Democratic Representation at 363–84, 589–628.

4. The legislative reapportionment of 1901 (Laws of Illinois, p. 6) remained in existence until 1955 (Ill.Rev.Stats. ch. 46, §§ 157, 158 (1953)), when the General Assembly reapportioned for the first time (Donovan v. Holzman, 8 Ill.2d 87, 132 N.E.2d 501 (1956)). The legislature passed a reapportionment act in 1963 but it was vetoed by the governor (Williams v. Kerner, 30 Ill.2d 11, 195 N.E.2d 680 (1964)).

35 general elections, the legislature has reapportioned itself only once. Nor is the judiciary commonly considered the most expert body to fix state legislative lines.

■ If every minority or other identifiable group demanded representation on the commission, it would necessarily become as large as the legislature (Carter v. Jury Commission, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970)) and probably would be as ineffective as the legislature has proved to be in reapportionment matters.[5]

Professor Dixon's testimony of February 18, 1970 before the Legislative Commission of the Illinois Constitutional Convention is enlightening in this regard. He suggested that:

" . . . the function of state legislative apportionment . . . [should be transferred] *to a bipartisan Commission with tie breaker* (emphasis his). By this device you would build both political realism and fairness into the basic districting pattern from which legislators are elected . . . The apportionment-districting task calls for philosophers-kings, but they are notoriously in short supply. We need to create some process for avoiding one-sided partisanship at the outset of redistricting, while preserving political realism. The answer is the bipartisan commission. . . . "

In Reynolds v. Sims, the Supreme Court made passing mention of compactness and contiguity but very little attention has been given to those concepts in the ensuing years. Suffice it to say there are no noncontiguous districts or enclaves in the August 7 plan. Obviously, as population equality approaches perfection, the concept of compactness must suffer.

The Skokie plaintiffs have provided an example of how this operates. They engaged the services of a private agency to prepare a map "wherein said legislative districts would be contiguous, compact, of substantially equal population and taking into regard traditional political boundary lines." The result was that every city or village within Cook County, outside of Chicago, was wholly contained within one legislative district. The population deviations were from minus 3.8 percent to plus 4.1 percent or a range deviation of almost 8 percent, as opposed to less than 1.5 percent in the August 7 plan. In addition, the plan provides *less* representation per person in every district outside of Cook County and *more* representation per person in every district in Cook County. It is doubtful whether the alternative plan could pass federal constitutional muster even if it was proffered by the state itself and purported to represent state apportionment policy.

Finally, our analysis of gerrymandering applies to compactness and we must conclude that in a near-absolute equality map these other factors pale into insignificance.

■ We conclude that, except for the population issue, the plaintiffs have failed to state a justiciable federal claim.

We express our appreciation to Chief Justice Underwood and the other members of the Illinois Supreme Court for their cooperation in accomplishing an expeditious resolution of these problems.

5. Finding that the August 7 plan insures one-man-one-vote, as we do, we cannot see any federal abridgement of the rights of independent voters or candidates. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).